# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARIAM YAHIA IBRAHEEM ISHAG,
individual and as parent and guardian
of her minor children Mn. W. and Ma. W.,

    Plaintiffs,

v.                                             CIVIL ACTION NO.: _____

REPUBLIC OF SUDAN,
c/o Ministry of External Affairs,

    Defendant.

_____/

## COMPLAINT

Comes now the Plaintiff, Mariam Yahia Ibraheem Ishag, individually and in her capacity as parent and guardian of her minor children, Mn. W. and Ma. W., (collectively referred to herein as "Ishag") and brings suit against the Republic of Sudan (referred to herein as "Sudan") pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, for injuries suffered by her and each of them as a result of Sudan's unlawful acts of hostage taking, torture, and other violations of the FSIA and would show as follows:

### PARTIES

1.  Plaintiff Mariam Ishag is a Sudanese citizen and a resident of the State of Virginia.

2.  Ms. Ishag was married to Daniel Wani, a U.S. Citizen, prior to their pending divorce.

3.  Plaintiff Mn. W., a minor child, is the son of Ms. Ishag and Mr. Wani and was born to them while they were husband and wife. Mn. W. was, at all times relevant to this

complaint, an American citizen by virtue of the citizenship and residency of his father. Ms. Ishag is the custodial parent and guardian of her son Mn. W.

4. Plaintiff Ma.W., a minor child, is the daughter of Ms. Ishag and Mr. Wani and was born to them while they were husband and wife. Ma. W. was at all times relevant to this complaint an American citizen. Ms. Ishag is the custodial parent and guardian of her daughter Ma. W.

5. Sudan is a foreign sovereign that was designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App § 2405(j)). Sudan was so designated during the occurrence of the matters described in this complaint, and continued to be so designated until December 2020.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331 and 28 U.S.C. § 1605A.

7. This Court has jurisdiction to hear a claim against Sudan because Sudan was a foreign sovereign designated as a state sponsor of terrorism at all times described in this complaint. *See* 28 U.S.C. §1605A(a)(2)(A)(i)(I). Further, although Sudan is no longer designated as a state sponsor of terrorism at the time of this claim, jurisdiction is proper if the foreign state "either remains so designated [as a state sponsor of terror] when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section." Id.

8. This action falls within the "terrorism exception" to sovereign immunity under the FSIA, 28 U.S.C. § 1605A(a)(1), which provides in relevant part that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which

money damages are sought against a foreign state for personal injury or death that was caused by an act of torture . . . [or] hostage taking . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

9. Under the terrorism exception to the FSIA, torture is defined to "have the meaning given . . . in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)." 28 U.S.C. § 1605A(h)(7). The Torture Victim Protection Act defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992), *codified at* 28 U.S.C. § 1350 (note).

10. Under the FSIA, hostage taking is defined as "seiz[ing] or detain[ing] and threaten[ing] to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage." 34 U.N. GAOR Supp. No. 46, at 345 (TIAS 11081).

11. This suit seeks money damages against Sudan and its agencies and instrumentalities for injury and harm caused to the Plaintiffs, and each of them, by Sudan's acts of terrorism, torture, and hostage taking.

12. These acts of terrorism, torture, and hostage taking were perpetrated by officials, members, agents and instrumentalities of Sudan while acting within the scope of their official capacities.

13. Plaintiffs Mn. W. and Ma. W. are both U.S. citizens and nationals within the meaning of the FSIA, and were such at the time of the acts of torture and hostage taking alleged herein. *See* 28 U.S.C. § 1605A(a)(ii) ("The court shall hear a claim under [the FSIA] if . . . the claimant or the victim was, at the time the act occurred a national of the United States.')

14. Plaintiff Ms. Ishag is a Sudanese national and was a Sudanese national at the time the acts of torture occurred. This Court has jurisdiction over Ms. Ishag's claims pursuant to 28 U.S.C. § 1605A(a)(2)(A)(ii) because she is a family member of U.S. citizen victims. *See Owens v. Republic of Sudan*, 864 F. 3d 751, 809 (D.C. Cir. 2017).

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4).

## STATEMENT OF FACTS
### BACKGROUND

16. Ms. Ishag was born November 3, 1987 in El-Gadarif, in a refugee camp, and is a Sudanese national currently living in Virginia.

17. Ms. Ishag was raised by her mother, who was an Ethiopian Orthodox Christian. Her father, a Sudanese Muslim, was absent from her life.

18. Ms. Ishag was baptized into the Orthodox Church and was raised as an Orthodox Christian. She attended school at a Catholic education center in El-Gadarif. Ms. Ishag finished Catholic school in 2004 and moved to Khartoum in June 2005 to attend college at Khartoum University where she received her degree as a medical doctor. Ms. Ishag was unable to complete her post-graduate medical training because of the events described in this complaint.

19. While in college, Ms. Ishag converted to Catholicism and, between 2005 and 2011, devoted much of her time working in various Catholic charities and volunteering at the church.

20. In 2010, she met her husband, Mr. Wani, who was a U.S. citizen. Ms. Ishag and Mr. Wani were married in St. Matthew's Cathedral in Khartoum on December 19, 2011.

21. Ms. Ishag and Mr. Wani had their first child, Mn.W., on November 25, 2012.

22. During this time, in addition to Ms. Ishag's work with the church and Catholic charities, she started a business farming land that she inherited from her mother. In addition to her farming business, Ms. Ishag operated a business renting space in a marketplace to vendors. She used the proceeds from farming and rentals to buy two additional properties and start a beauty salon business.

23. By September 2013, Ms. Ishag had established a stable life in Sudan and was happily settled in Khartoum.

## Arrest

24. On or around September 2013, Ms. Ishag was at church and noticed that visitors of the church asking members of the congregation about her and taking pictures of her and her son.

25. She also started receiving phone calls from a man named Al Samani Al Hadi, who claimed to be her brother, although she was not aware that she had a brother. The man asked to meet her, but refused to come to Ms. Ishag's home.

26. Ms. Ishag then received a phone call from the Sudanese police, who asked her to come to the Hilat Koko Police Station. Ms. Ishag, Mr. Wani, and Mn. W. went to the police

station as requested, where they met three police officers and the man identified as Mr. Al Hadi, who claimed to be Ms. Ishag's brother.

27. At this meeting, the police specifically asked Ms. Ishag about her religion. When she informed them that she was Catholic, Mr. Al Hadi told the police officers that she should not be Catholic, since her father was a Muslim.

28. Ms. Ishag, Mr. Wani and Mn. W. were allowed to go home, but they were called back to the police station days later, on September 15, 2013. Ms. Ishag and Mr. Wani went again, with Mn. W. This time, they were immediately taken to an interrogation room. A police officer informed them that they were under arrest, and that they were accused of committing adultery because their marriage was invalid.

29. Ms. Ishag, Mr. Wani and Mn. W. were held at the Hilat Koko police station and were denied access to a lawyer. They were, however, able to secure bail.

30. Ms. Ishag's trial was set for January 2014. On December 24, 2013, two weeks before the trial, she was again taken into custody at the Haj Yossif police station. Mn. W. was also taken into custody with her. During this time in custody, Ms. Ishag was denied access to a lawyer.

31. Ms. Ishag and Mn. W. were held at the Haj Yossif police station until trial, when they were transferred to Omdurman Women's Prison.

**Detention and Birth of Ma. W.**

32. The conditions of Ms. Ishag's and Mn. W.'s detention were inhumane. They were held in a small cell with up to 50 other prisoners, with only a small window and no fresh air. The confined space and poor ventilation made it difficult to breathe. The cell was infested with mosquitos and frogs. The prisoners in the cell were denied basic privacy.

33. During their detention, Ms. Ishag and Mn. W. were without adequate fresh water and were not given enough food to eat. The prison had one sink and bathroom. Ms. Ishag was required to stand in line for use of the bathroom but, occasionally, was unable to actually use the bathroom after standing in line. While in the cell at the police station, she was forced to use a bucket as a commode inside of the cell and in front of other prisoners.

34. In prison, the guards would shackle Ms. Ishag, sometimes for up to three days at a time. The shackles were heavy and painful. Mn. W. was with Ms. Ishag the entire time. Because of the shackles, Ms. Ishag was unable to take care of her son properly. Mn.W. began to walk while he and Ms. Ishag were in prison. The shackles prevented Ms. Ishag from caring for him, playing with him, or from doing any of the normal activities a parent would do with a child.

35. Ms. Ishag constantly feared that Mn. W. would be taken from her. The prison was filled with violent criminals, who threatened to take Mn. W. from her, to kill Ms. Ishag and Mn. W., and to kill her unborn child. Ms. Ishag forced herself to stay awake out of fear that something would happen to Mn. W. while she was asleep.

36. The prison guards continuously threatened and abused Ms. Ishag while she was in prison. Even while pregnant, she was beaten with sticks, kicked, and spat upon. The guards did not beat Mn. W., but he was present during and witnessed Ms. Ishag's beatings, and was scared tremendously.

37. The guards also threatened Ms. Ishag, and told her that if she would admit to being a Muslim, she would get out of prison, but if she did not she would die.

38. Ms. Ishag was sent to solitary confinement three times, during which time she was locked in a cell so small she could only stand or sit with her legs crossed. Mn. W. was

separated from Ms. Ishag during these times.  Ms. Ishag did not know who had her son and feared he was not being cared for.

39.     Mn. W. was sick continuously throughout his imprisonment with Ms. Ishag.  His health suffered because of the inhumane environment in which he and his mother were kept and the fact that he was deprived of the care normally provided by a mother to a child.

40.     Likewise, the unsanitary conditions were threatening to Ms. Ishag's pregnancy.  Although there was a health clinic inside the prison, the clinic lacked basic medical supplies.  Ms. Ishag could not get sufficient pre-natal care.

41.     Ms. Ishag went into labor three weeks prematurely.  When she requested help, the guards did not believe her.  The guards called the prison midwife, who confirmed that Ms. Ishag was in labor.  During her labor, the prison was without electricity.  The guards forced Ms. Ishag to give birth while shackled to the floor.  Ma. W was born on May 27, 2014.

42.     Even after giving birth, Ms. Ishag was not allowed to leave for two days, during which time she remained shackled.

## Trial

43.     Ms. Ishag's trial began on January 6, 2014 before the Second Magistrate Court.  On February 24, 2014, the Court charged her with a second crime, the crime of apostacy, because she was alleged to have converted from Islam to Christianity. After the charge of apostacy was added, the trial was held in the Haj Yossif General Court.

44.     On May 11, 2014, Ms. Ishag was found guilty of both apostacy and adultery, while Mr. Wani was found not guilty of the charge of adultery against him.  She was sentenced to death for apostacy and 100 lashes for her conviction of adultery.

45. The judge informed Ms. Ishag that she had three days to renounce her Christian faith and convert to Islam, or she would be sentenced to death. During the three days between Ms. Ishag's conviction and sentencing hearing, the court sent imams to meet with her at the prison to try to convince Ms. Ishag to convert to Islam.

46. On May 22, 2014, Ms. Ishag appealed her conviction to the Court of Appeal. On June 23, 2014, after almost six months of inhumane treatment and abuse at Omdurman Women's Prison for Ms. Ishag and her two children, Ms. Ishag's conviction was overturned, and she and her children were released.

## Post Prison

47. On the day of her release, the prison was surrounded by media and Islamic extremists. The extremists threatened to kill Ms. Ishag and were protesting her release.

48. Ms. Ishag was unable to return home with Mn. W. and Ma. W. because her home was also surrounded by extremists. She sought shelter first at St. Matthew's Cathedral, and then at the U.S. Embassy. Ms. Ishag, Mn. W., and Ma. W. were reunited with Mr. Wani at the U.S. Embassy.

49. Because of the threats from violent extremists, Ms. Ishag and her family were forced to flee Sudan, leaving behind their careers, property, and personal belongings.

50. The officials at the U.S. Embassy arranged for Ms. Ishag and her family's departure from Sudan. However, when they arrived at the airport, the whole family, including Mn. W. and Ma. W., were arrested by intelligence agents from the Sudan National Intelligence and Security Services (NISS).

51. The agents accused Ms. Ishag and her family of having fake travel documents. The family was held and questioned for many hours, until the NISS agents said that if Ms. Ishag

agreed to relinquish all her land and properties to the government of Sudan, they would allow her and her family to leave and travel to the United States.

52. She was given a document to sign that released all her property to the Sudanese government. Out of fear for her life and the lives of her family, Ms. Ishag signed the document. However, the NISS agents refused to release the family, as they had promised.

53. Instead, Ms. Ishag and her family were held in a room, without air conditioning or running water, for five hours in the heat of the summer, until they were transferred to the El Shargi police station.

54. There, Ms. Ishag was charged with forgery and providing false information to the authorities. Mr. Wani, Mn. W., and Ma. W. were released from custody, but Ms. Ishag was detained another day and then released on bail.

55. During this time, Ms. Ishag, Mr. Wani, Mn. W., and Ma. W. stayed at the U.S. Embassy. After a month, the Sudanese government agreed with the Italian government to allow Ms. Ishag and her family to fly out of Sudan to Italy. The family was then able to travel from Italy to the United States.

## COUNT ONE

### Intentional Infliction of Emotional Distress and Solatium Damages for Mn. W.

56. Plaintiffs incorporate by reference paragraphs one through fifty-five of this Complaint as if set forth herein.

57. Mn. W. is a U.S. citizen and was a U.S. citizen at all times relevant to this complaint.

58. Mn. W. is entitled to solatium damages caused by Sudan's hostage taking, pursuant to 28 U.S.C. § 1605A(c).

59. Sudan held Mn. W. captive for 181 days in Omdurman Women's Prison with his mother, Ms. Ishag.

60. Sudan engaged in hostage taking by detaining, continuing to detain, and threatening to injure Mn. W. in order to exert influence over Ms. Ishag and to extract a confession from her on the charges of adultery and apostasy and to coerce her to renounce her Christian faith.

61. As a consequence of Sudan's hostage-taking, Mn. W. suffered permanent physical injury and has suffered severe and permanent psychological and emotional harm. He is entitled to compensation for those physical injuries and to solatium damages pursuant to 28 U.S.C. § 1605A(c).

## COUNT TWO

### Intentional Infliction of Emotional Distress and Solatium Damages for Ma. W.

62. Plaintiffs incorporate by reference paragraphs one through fifty-five of this Complaint as if set forth herein.

63. Ma. W. is a U.S. citizen and was a U.S. citizen at all times relevant to this complaint.

64. Ma. W. is entitled to solatium damages caused by Sudan's hostage taking, pursuant to 28 U.S.C. § 1605A(c).

65. Sudan held Ma. W. captive at Omdurman Women's Prison from the moment of her birth on May 27, 2014 until Ms. Ishag's release on June 23, 2014.

66. Sudan engaged in hostage taking by detaining, continuing to detain, and threatening to injure Ma. W. in order to exert influence over Ms. Ishag and to extract a confession from her on the charges of adultery and apostacy and to coerce her to renounce her Christian faith.

67. As a consequence of Sudan's hostage-taking, Ma. W. suffered permanent physical injury and has suffered severe and permanent psychological and emotional harm.  She is entitled to compensation for those physical injuries and is entitled to solatium damages pursuant to 28 U.S.C. § 1605A(c).

### COUNT THREE

### Intentional Infliction of Emotional Distress and Solatium Damages for Mariam Ishag

68. Plaintiffs incorporate by reference all prior paragraphs of this complaint.

69. Ms. Ishag is entitled to solatium damages because of Sudan's intentionally inflicted emotional distress upon Ms. Ishag through the hostage taking of Mn. W and Ma. W., who are Ms. Ishag's children and immediate family members.

70. Sudan held Ms. Ishag and her minor child, Mn. W., captive for 181 days.

71. Sudan engaged in hostage taking by detaining, continuing to detain, and threatening to kill or injure Mn. W. and, later, Ma. W. in order to exert influence on Ms. Ishag. Sudan's hostage taking was intended to extract confessions from Ms. Ishag on the charges of adultery and apostacy; to coerce her to denounce her Christian faith; and to coerce her into relinquishing valuable personal and real property rights to Sudan.

72. During Ms. Ishag's captivity, Sudan intentionally inflicted emotional distress upon Ms. Ishag by forcing her to witness the captivity and brutal treatment of her child, Ma. W., and to witness him be deprived of basic care and any semblance of an ordinary childhood.  Ms.

Ishag was physical present during this captivity and was forced to witness the effects upon Mn. W. while being unable to help or comfort him.

73. This feeling of extreme distress at the treatment of her child, coupled with her inability to help, inflicted severe mental and physical pain and suffering upon Ms. Ishag, including the severe mental suffering caused by the threat of imminent death to herself and to her children, Mn. W.

74. Furthermore, Sudan intentionally inflicted emotional distress on Ms. Ishag by forcing her to give birth to Ma. W. while in captivity.  Ma. W. was deprived of adequate pre-, peri-, and post-natal care, and Ms. Ishag was forced to witness and experience this lack of care as it took place.

75. Sudan's conduct with regard to Ms. Ishag was extreme and outrageous, and was intended to cause emotional distress to Ms. Ishag.  By witnessing the mistreatment and lack of care for her infant, coupled with her inability to rectify the situation, Ms. Ishag suffered severe mental and physical pain and suffering, including the severe mental suffering caused by the threat of imminent death to herself and to her children.  Sudan's conduct was the actual and proximate cause of Ms. Ishag's emotional distress.

76. Further, the captivity, the intentional infliction of emotional distress on her and her witnessing the hostage taking of her children had lasting effects on Ms. Ishag's marriage. Both strained her relationship with Mr. Wani. They had to seek professional counseling and are now divorced.

77. As a consequence of Sudan's intentional infliction of emotional distress through the torture and hostage taking of Mn. W. and Ma. W., Ms. Ishag suffered permanent physical injuries and severe and permanent psychological and emotional harm and is entitled to

compensation for those physical injuries and is entitled to solatium damages pursuant to 28 U.S.C. 1605A(c).

## COUNT FOUR

### Punitive Damages for Mariam Ishag, Mn. W., and Ma. W.

78. Plaintiffs incorporate by reference all prior paragraphs of this complaint.

79. Plaintiffs, and each of them, are entitled to punitive damages under 28 U.S.C. § 1605A(c) for Sudan's unlawful torture and hostage taking of Ms. Ishag, and for the unlawful hostage taking of Mn.W. and Ma.W.

80. Sudan's conduct in carrying out its unlawful torture and hostage taking was outrageous, malicious, and in willful and wanton disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages against Sudan.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following damages and relief:

a. Mn. W. is entitled to solatium damages for the intentional infliction of emotional distress suffered by Sudan's hostage taking.

b. Ma. W. is entitled to solatium damages for the intentional infliction of emotional distress suffered by Sudan's hostage taking.

c. Ms. Ishag is entitled to solatium damages for the intentional infliction of emotional distress suffered by Sudan's torture and hostage taking.

d. All Plaintiffs are entitled to punitive damages pursuant to 28 U.S.C. § 1605A(c).

e. All Plaintiffs are entitled to their full costs and attorney's fees as incidental damages.

f. The Court should award such further relief as it deems just and proper.

g. The damages for each of the plaintiffs are permanent and will continue into the future.

Respectfully submitted,

*/s/ J. Nixon Daniel, III*
J. Nixon Daniel, III
D.C. Bar No. FL0031
jnd@beggslane.com
David L. McGee
D.C. Bar No. FL0037
dlm@beggslane.com
Adam L. Royal
D.C. Bar No. FL0038
alr@beggslane.com
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
Attorneys for Plaintiffs